**ORAL ARGUMENT NOT YET SCHEDULED**

No. 10-5059

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

JEREMY PINSON, *et al.*,
*Plaintiffs-Petitioners*

v.

CHARLES E. SAMUELS, JR., *et al.*,
*Defendants-Respondents*

_____

On Appeal from the United States District Court
for the District of Columbia (Unassigned)

_____

**BRIEF OF COURT-APPOINTED *AMICUS CURIAE*
ON BEHALF OF PETITIONERS**

Anthony F. Shelley
*Counsel of Record*
Dawn E. Murphy-Johnson
Miller & Chevalier Chartered
655 Fifteenth St., NW, Suite 900
Washington, DC 20005
Telephone: (202) 626-5924
Facsimile: (202) 626-5801
Email: ashelley@milchev.com

June 5, 2013                    *Court-Appointed Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES
### LIST OF PARTIES AND *AMICUS CURIAE*

Petitioners are Jeremy Pinson, Andrew Wesley Hobbs, Jeremy Brown, Antoine Bruce, and John Samuel Leigh, who are all prisoners in federal custody. Respondent are various current or former federal prison officials, sued in their official and individual capacities. These federal prison officials are Charles E. Samuels, Jr., Harley G. Lappin, Joyce K. Conley, Raymond E. Holt, Delbert G. Savers, Rufus Williams, John T. Rathman, Lisa Austin, and Lee H. Green. The *Amicus Curiae* in support of Petitioners is court-appointed counsel, Anthony F. Shelley of Miller & Chevalier Chartered.

### RULINGS UNDER REVIEW

The Court has construed the present proceedings as in the nature of mandamus. The District Court ruling at which the mandamus proceedings are aimed is the order of District Judge Colleen Kollar- Kotelly transferring the complaint to the Northern District of Alabama (included in the *amicus*'s Appendix [hereinafter "AA"] at 21-22), along with the District Court clerk's rejection of certain documents filed by Petitioners.

### RELATED CASES

The *amicus* is not aware of any cases in this Circuit or elsewhere in which Petitioners have sought the same mandamus relief.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ..................................................................................C-1

LIST OF PARTIES AND *AMICUS CURIAE* ......................................C-1

RULINGS UNDER REVIEW ................................................................C-1

RELATED CASES ................................................................................C-1

INTEREST OF THE *AMICUS CURIAE* .................................................1

JURISDICTIONAL STATEMENT .............................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............................2

RELEVANT STATUTES AND REGULATIONS.......................................3

STATEMENT OF THE CASE.................................................................3

     A.   The Allegations in the Complaint...........................................4

     B.   District Court Proceedings...................................................9

     C.   Proceedings in this Court...................................................11

STATEMENT OF FACTS .....................................................................13

SUMMARY OF ARGUMENT ................................................................45

ARGUMENT .......................................................................................16

I.      STANDARD OF REVIEW ............................................................16

II.     THE COURT SHOULD GRANT PINSON'S MOTION
       TO PROCEED *IN FORMA PAUPERIS* AND STAY
       COLLECTION OF THE FILING FEE.........................................17

i

A. Because Pinson Adequately Alleged in His Complaint That He Was in Imminent Danger of Serious Physical Injury, He Overcomes the PLRA's "Three Strikes" Rule .................... 17

B. The Court Should Stay Collection of the Filing Fee Pinson Owes Because the PLRA Imposes a 20% "Per Prisoner" Cap ........................ 23

    1. This Court Has Already Adopted a 20% Per-Prisoner Cap ......... 25

    2. The PLRA's Text and Legislative History Favor the Per-Prisoner Approach ........................................................ 28

    3. The Court Should Adopt the Per-Prisoner Approach Because it Avoids Constitutional Problems ................................ 31

III. PETITIONERS HAVE STANDING TO CHALLENGE THE TRANSFER ORDER AND THE REJECTION OF PLEADINGS ............. 34

IV. THE COURT SHOULD ISSUE A WRIT OF MANDAMUS TO VACATE THE TRANSFER ORDER AND TO DIRECT THE CLERK TO PRESENT TO A DISTRICT JUDGE THE REJECTED FILINGS ................................................................... 39

B. Mandamus Is Appropriate to Vacate the Transfer Order .................... 41

    1. The District Court Applied the Wrong Venue Criteria and Otherwise Abused Its Judicial Authority in Transferring the Case ................................ 41

    2. On the Transfer Order, There Is No Other Adequate Means than Mandamus to Obtain Relief .................... 49

C. Mandamus is Appropriate to Instruct the District Court Clerk to Present the Refused Motion to a District Judge .................... 52

CONCLUSION ................................................................................... 56

Certificate of Compliance with Rule 32(a) ........................................... *Post*

Certificate of Service ............................................................................ *Post*

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*In re Apple, Inc.*,
  602 F.3d 909 (8th Cir. 2010) ...............................................................41

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................19

*\*Ashley v. Dilworth*,
  147 F.3d 715 (8th Cir. 1998) ........................................................17, 20, 21, 23

*Atchison v. Collins*,
  288 F.3d 177 (5th Cir. 2002) ...............................................................25

*Aurelius Capital Partners, LP v. Republic of Arg.*,
  584 F.3d 120 (2d Cir. 2009) ...............................................................38

*Bankers Life & Cas. Co. v. Holland*,
  346 U.S. 379 (1953)....................................................................40, 52, 55

*Beattie v. United States*,
  756 F.2d 91 (D.C. Cir. 1984), *overruled on other grounds by*
  *Smith v. United States*, 507 U.S. 197 (1993) ...............................................46, 47

*Belize Soc. Dev., Ltd. v. Gov't of Belize*,
  668 F.3d 724 (D.C. Cir. 2012)...........................................................40, 49

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971)................................................................45, 46, 47, 48

*In re Briscoe*,
  976 F.2d 1425 (D.C. Cir. 1992)..........................................................41, 51

*Brown v. District of Columbia*,
  514 F.3d 1279 (D.C. Cir. 2008).............................................................4

*Cameron v. Thornburgh*,
  983 F.2d 253 (D.C. Cir. 1993)...........................................................43, 45

*Carlson v. Green*,
  446 U.S. 14 (1980)............................................................................45

*Cheney v. U.S. Dist. Court for D.C.*,
   542 U.S. 367 (2004)................................................................40

*Christensen v. Big Horn County Bd. of County Comm'rs*,
   374 F. App'x 821 (10th Cir. 2010)....................................25

*Coalition for Responsible Regulation, Inc. v. EPA*,
   684 F.3d 102 (D.C. Cir. 2012)...........................................29

*In re Corrugated Container Anti-Trust Litig.*,
   620 F.2d 1086 (5th Cir. 1980) .....................................51, 52

*Cunningham Bros., Inc. v. Bail*,
   407 F.2d 1165 (7th Cir. 1969) ...........................................36

*Fine v. McGuire*,
   433 F.2d 499 (D.C. Cir. 1970)...........................................48

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996)..............................................35

*Ford v. Mabus*,
   629 F.3d 198 (D.C. Cir. 2010)...........................................29

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)..............................................................35

*Gilardi v. Schroeder*,
   833 F.2d 1226 (7th Cir. 1987) ...........................................54

*Gomez v. United States*,
   490 U.S. 858 (1989)..............................................................33

*In re Grant*,
   635 F.3d 1227 (D.C. Cir. 2011)....................................12, 18

*In re Green*,
   669 F.2d 779 (D.C. Cir. 1981).................................26, 27, 28

*Gross v. Owen*,
   221 F.2d 94 (D.C. Cir. 1955)..............................................36

iv

*Ex parte Hull*,
    312 U.S. 546 (1941).................................................................................37

*Hurt v. Social Sec. Admin.*,
    544 F.3d 308 (D.C. Cir. 2008)............................................................28

*Ibrahim v. District of Columbia*,
    463 F.3d 3 (D.C. Cir. 1999)...............................................17, 18, 19

*Innovatit Seafood Sys., LLC v. Comm'r for Patents*,
    240 F.R.D. 23 (D.D.C. 2007)..............................................................54

*Kerr v. U.S. Dist. Court for N. Dist. of Cal.*,
    426 U.S. 394 (1976).............................................................................40

*In re Kissi*,
    652 F.3d 39 (D.C. Cir. 2011)..............................................................17

*Lefkowitz v. Citi-Equity Group, Inc.*,
    146 F.3d 609 (8th Cir. 1998)..............................................................25

*Leonard v. Lacy*,
    88 F.3d 181 (2d Cir. 1996).................................................................30

*Loya v. Desert Sands Unified Sch. Dist.*,
    721 F.2d 279 (9th Cir. 1983)..............................................................54

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).............................................................................35

*McClellon v. Lone Star Gas Co.*,
    66 F.3d 98 (5th Cir. 1995)..................................................................53

*Mitchell v. Fed. Bureau of Prisons*,
    587 F.3d 415 (D.C. Cir. 2009)..........................................18, 19, 20, 21

*Munsell v. Dep't of Agric.*,
    509 F.3d 572 (D.C. Cir. 2007)...........................................................45

*Nat'l Ass'n of Home Builders v. Norton*,
    415 F.3d 8 (D.C. Cir. 2005)...............................................................43

*In re Nat'l Presto Indus., Inc.*,
  347 F.3d 662 (7th Cir. 2003) ...........................................................50

*Natural Res. Def. Council v. Pena*,
  147 F.3d 1012 (D.C. Cir. 1998) .......................................................35

*Nestor v. Hershey*,
  425 F.2d 504 (D.C. Cir. 1969) ...................................................42, 50

*Newlin v. Helman*,
  123 F.3d 429, 436 (7th Cir. 1997), *overruled in part on other grounds*
  *by Lee v. Clinton*, 209 F.3d 1025 (7th Cir. 2000) *and Walker v. O'Brien*,
  216 F.3d 626 (7th Cir. 2000); .........................................25, 29, 32, 33

*Nowell v. Dick*,
  413 F.2d 1204 (5th Cir. 1969) .........................................................50

*Parker v. District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007)........................................................27

*Renoir v. Governor of Virginia*,
  755 F. Supp. 2d 82 (D.D.C. 2010)..............................................21, 23

*Roofing & Sheet Metal Servs., Inc. v. LaQuinta Motor Inns, Inc.*,
  689 F.2d 982 (11th Cir. 1982) ...............................................50, 51, 52

*In re Scott*,
  709 F.2d 717 (D.C. Cir. 1983)........................................................41

*In re Sealed Case No. 98-5062*,
  141 F.3d 337 (D.C. Cir. 1998)........................................................41

*SEC v. e-Smart Techs., Inc.*,
  No. 11-895, 2013 U.S. Dist. LEXIS 29138 (D.D.C. Mar. 1, 2013)..................47

*In re Smith*,
  114 F.3d 1247 (D.C. Cir. 1997)...............................................20, 30, 33

*Stafford v. Briggs*,
  444 U.S. 527 (1980)...............................................................43, 45

*Starnes v. McGuire*,
  512 F.2d 918 (D.C. Cir. 1974)............................................2, 48, 51

*In re Stewart*,
   641 F.3d 1271 (11th Cir. 2011) ........................................................36

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)........................................................................34

*Taylor v. U.S. Dep't of Agric.*,
   629 F.3d 241 (D.C. Cir. 2011).........................................................28

*Torres v. O'Quinn*,
   612 F.3d 237 (4th Cir. 2010) ....................................... 24, 27, 28, 29, 30, 31, 33

*Tucker v. Branker*,
   142 F.3d 1294 (D.C. Cir. 1998)................................... 15, 17, 25, 26, 27, 28, 32

*Ukiah Adventist Hosp. v. FTC*,
   981 F.2d 543 (D.C. Cir. 1992).....................................................41, 45

*In re United States Parole Comm'n*,
   793 F.2d 338, 348 (D.C. Cir. 1986 ), *vacated for en banc rehearing
   In re United States Parole Comm'n*, 798 F.2d 1532 (D.C. Cir. 1986),
   *remanded as moot In re United States Parole Comm'n,* No. 85-1205,
   1987 U.S. App. LEXIS 18336 (D.C. Cir. Dec. 30, 1987). ................43

*United States v. Gonzales*,
   520 U.S. 1 (1997)............................................................................29

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)........................................................................35

*Whitfield v. Scully*,
   241 F.3d 264 (2d Cir. 2001) ...................................................24, 28, 29, 32, 33

*Will v. United States*,
   389 U.S. 90 (1967)..........................................................................40

## Statutes

28 U.S.C. § 1294 ...................................................................................51

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1361 ...................................................................................43

28 U.S.C. § 1391 ............................................. 9, 15, 16, 42, 43, 44, 45, 49

28 U.S.C. § 1404 ............................................................................49, 50

28 U.S.C. § 1406................................................................9, 49, 50, 52

All Writs Act,
    28 U.S.C. § 1651 ..........................................................................2

Prison Litigation Reform Act,
    28 U.S.C. § 1915......................... 2, 11, 13, 14, 17, 18, 19, 20, 23, 24, 28, 29, 34

### *Other Authorities*

141 Cong. Rec. S7526 (daily ed. May 25, 1995)....................................30

141 Cong. Rec. S14413 (daily ed. Sept. 27, 1995)................................31

141 Cong. Rec. S14626 (daily ed. Sept. 29, 1995)................................30

142 Cong. Rec. S2226 (daily ed. Mar. 18, 1996) ..................................30

Fed. R. App. P. 28 .................................................................................1

Fed. R. App. P. 43 ...............................................................................43

Fed. R. Civ. P. 5 ......................................................................16, 53, 54

Fed. R. Civ. P. 24 ...............................................................................39

BOP Program Statement 5217.01 (Nov. 19, 2008) ................................5, 6, 7, 8, 44

*Authorities on which we chiefly rely are marked with an asterisk.

## INTEREST OF THE *AMICUS CURIAE*

Counsel was appointed by the Court to file an *amicus* brief in support of Petitioners.  Because the *amicus* is Court-appointed, this *amicus* brief contains the items required by Fed. R. App. P. 28(a) and the related Circuit Rule.  The *amicus* has also filed, in accordance with Fed. R. App. P. 28(f) and the related Circuit Rule as those apply to an appellant's brief, an addendum comprising the relevant portions of statutes and regulations.  For the Court's convenience, the *amicus* additionally is submitting an Appendix containing items from the District Court's and this Court's record.

## JURISDICTIONAL STATEMENT

Petitioner Jeremy Pinson sought relief for violations of his constitutional rights in the United States District Court for the District of Columbia, which had jurisdiction under 28 U.S.C. § 1331.  The District Court found venue was improper and ordered this matter transferred to the Northern District of Alabama.  AA21-22. Pinson appealed the transfer order to this Court (AA31), which the Court construed as a petition for a writ of mandamus.  AA42.  Pinson and Petitioners Andrew Wesley Hobbs, Jeremy Brown, Antoine Bruce, and John Samuel Leigh (among others) subsequently filed an amended notice of appeal challenging the transfer order, along with the District Court clerk's refusal to accept filings.  AA77-81. The Court construed the amended notice of appeal as a supplement to the

mandamus petition.  AA105.  The Court has jurisdiction over the mandamus

petition under the All Writs Act, 28 U.S.C. § 1651.  Moreover, as a result of

Pinson's mandamus petition to this Court, the matter was not physically transferred

to Alabama, and the Court therefore retains its jurisdiction to hear the petition.  *See*

*Starnes v. McGuire*, 512 F.2d 918, 924 (D.C. Cir. 1974).

Pinson has also moved to proceed on the mandamus petition *in forma*

*pauperis*, a motion on which the Court has requested briefing.  This Court has

jurisdiction over Pinson's *in forma pauperis* motion pursuant to 28 U.S.C.

§ 1915(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Can Pinson proceed *in forma pauperis* under the "imminent danger"

exception (28 U.S.C. § 1915(g)) to the otherwise applicable prohibition in the

Prison Litigation Reform Act ("PLRA") against *in forma pauperis* status for

prisoners who have previously filed three or more actions or appeals dismissed as

frivolous, malicious, or failing to state a claim upon which relief may be granted?

2.      Assuming Pinson can proceed *in forma pauperis* under the PLRA,

does the PLRA (28 U.S.C. § 1915(b)(2)) authorize collection of only a maximum

of 20% per month of a prisoner's relevant income to satisfy the outstanding filing

fees of *all* actions or appeals filed by the prisoner, regardless of the total number of

civil actions or appeals filed, or does the statute authorize collection of 20% each

month for *each* civil action or appeal for which a filing fee remains outstanding?

3.    Do Petitioners have standing to seek mandamus to challenge the

District Court's transfer order or the clerk's refusal to accept documents?

4.    Should this Court issue a writ of mandamus to negate the District

Court's transfer order or to require the clerk to present to a District Judge

documents the clerk has refused to accept?

## RELEVANT STATUTES AND REGULATIONS

Relevant portions of the PLRA, venue statutes, and Bureau of Prison

("BOP") guidance procedures are set out in the Addendum immediately following

this brief.

## STATEMENT OF THE CASE

The mandamus petition presents a host of difficult legal issues, some on

which the Circuits have split.  Overall, the Court must address Pinson's right to

proceed *in forma pauperis*, the standing of Petitioners, and the propriety for issuing

a writ of mandamus to upend the District Court's transfer order or the District

Court clerk's refusal to accept filings submitted by Petitioners.  In the end, the

answer to each of the relevant legal questions favors Petitioners, and the Court

should issue the writ.

Just as the legal issues are complicated, so too is the course of proceedings. We begin by summarizing the allegations in the complaint (read liberally in in Pinson's favor because he is *pro se*, *see Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008)), then turn to the District Court and its clerk's actions, and thereafter summarize the proceedings so far in this Court.

### A.     The Allegations in the Complaint

Pinson's *pro se* complaint was received in the District Court on December 28, 2009, and docketed in the District Court on January 19, 2010.  AA4.  It is brought against the various federal officials who are Respondents here and raises two counts stemming from violations of his constitutional rights while he was incarcerated in the Federal Correctional Institute ("FCI") in Talladega, Alabama. AA6-9.  Defendants below, and Respondents here, include BOP officials located in Washington, D.C., Georgia, Texas, and Alabama.  Among them are Harley G. Lappin and Joyce K. Conley, who were respectively the BOP Director and Assistant Director, Correctional Programs Division, at the time the complaint was filed.  They are based in Washington, D.C.  AA4. The Georgia-based Defendants-Respondents include Raymond E. Holt, BOP Regional Director; Rufus Williams, BOP Regional Corrections Service Administrator; and Lee H. Green, BOP Hearings Administrator.  AA5.  The Texas-based Defendants-Respondents are Delbert G. Savers, BOP Designations and Sentence Computation Center Chief;

- 4 -

and Lisa Austin, Chief Designator for the BOP.  AA5.  The sole Alabama-based

Defendant-Respondent is John T. Rathman, warden at FCI Talladega.  Pinson sued

all of them for damages in their individual capacities and for declaratory and

injunctive relief in their official capacities.  AA5.

In "Claim One" of his complaint, Pinson alleges that the adoption and

application to him of BOP Program Statement 5217.01 constitutes cruel and

unusual punishment under the Eighth Amendment.  AA6-9.  The Program

Statement creates "Special Management Units" or "SMUs" within various prisons,

including FCI Talladega.  AA7.  The SMUs' purpose is to segregate in a single

unit inmates who participated in "geographic group, gang related activity" or

"disruptive conduct of the greatest severity," so as supposedly to ensure the safety,

security, or orderly operation of the prison while they complete a four-step

program after which they can join the general prison population.   AA7; *see also*

BOP Program Statement 5217.01 (Nov. 19, 2008) (Addendum accompanying this

Br., at 7-8).  Many of the gang members housed in SMUs are "enemies of other

gangs housed therein who have vowed to murder or do serious bodily injury

against rival gangmembers."  AA7.  According to Pinson, BOP Program Statement

5217.01 does not make adequate provision for the separation of known enemies;

quite to the opposite, it requires "inmates to coexist peacefully [in SMUs] with

known enemies and makes no distinction between assaultive and predacious

inmates, and those who are victims of such behavior." AA7. Pinson alleges that hundreds of assaults, in addition to several hostage situations and suicides, have occurred in SMUs. AA7.

The complaint asserts that Pinson himself, at the time of the filing of the complaint, was housed in an SMU with rival gang members. AA8. It further asserts that he was in imminent danger of death or bodily injury due to his placement in an SMU. AA9.[1]

Pinson also, in Claim One, notes that he is a homosexual and that, on that basis, "faced a substantial risk of harm" in an SMU. AA8. In Pinson's view, Program Statement 5217.01 makes no provision for avoiding placement of a homosexual in an SMU, where those predacious to homosexuals are known to be present in the SMU. AA7-8.

In Count One, Pinson alleges that Respondents Lappin and Conley (both BOP officials located in Washington, D.C.) formulated and approved Program Statement 5217.01 and are, as Pinson avers, aware of the violence that occurs in

---

[1] Pinson later, in support of his mandamus petition, noted that, "[d]uring the pendency of this appeal," one Bobby Crowley "was murdered by a rival gangmember, as the Complaint stated was the claim." AA167; *see also* AA75, AA111. He also noted, in support of his motion to proceed *in forma pauperis* in this Court, that he (Pinson) "was nearly stabbed." AA167.

these units and have failed to take "reasonable" steps to prevent prisoner violence. AA6, AA8.

Pinson adds that Conley, along with Respondent Holt (a BOP official in Georgia), was also responsible for designating 98 inmates, including Pinson, to the SMU at the FCI Talladega.  AA8; *see* BOP Program Statement 5217.01 (Addendum at 8) (noting Regional Director's role in placement).  They were aware that Pinson faced substantial risk if placed in an SMU because he is a homosexual. AA8.  Other Respondents, the complaint alleges, also played a role in Pinson's placement at the SMU and in creating risks of serious harm to Pinson, with all of their actions "supervised or coordinated from Washington, D.C."  AA8. Respondent Green (based in Georgia) conducted Pinson's hearing on referral to the SMU and was aware of the substantial risk that Pinson faced if he received such a placement.  AA9; *see* BOP Program Stmt. 5217.01 (Addendum at 8) (noting prisoner's right to a hearing regarding placement in an SMU).  Respondents Savers and Austin (who are located in Texas) also designated Pinson to the SMU, but failed to identify him as a former member of the "Sureno" gang and failed to separate him from known enemies.  AA8.  Respondents Rathman (based in Alabama) and Williams (based in Georgia) supervised the operations at the SMU in FCI Talladega and created life-threatening conditions by forcing "rival inmates to house together."  AA8.

In "Claim Two" of his complaint, Pinson alleges that his First Amendment rights were violated because his legal mail was improperly processed in FCI Talladega. According to the complaint, Lappin, Conley, Holt, and Rathman "permitted correctional staff to open privileged legal communications outside his presence and to hold the same for up to 2 weeks." AA9. Pinson here attacks BOP policies that allow prison officials to disregard the legal nature of his prisoner mail, which "were created and are supervised from Washington, D.C." AA9. In relevant part, he says that BOP regulations require all legal mail "to use specific language in identifying privileged correspondence and ignore any markings which indicate the legal nature of correspondence[,] but which don't use the specific language in the regulation." AA9. And indeed, Program Statement 5217.01 contains special restrictions on prisoner correspondence and mail. *See* BOP Program Statement 5217.01 (Addendum at 12). Due to these policies, on at least two occasions, Pinson did not receive mail from U.S. district courts that contained court-ordered deadlines he missed. AA9.

For relief on his claims, Pinson seeks declaratory relief finding Program Statement 5217.01 to violate the Eighth Amendment and "[i]njunctive [r]elief enjoining defendants from coercing inmates in [SMUs] to interact and come into physical contact with rival gang members or individuals whom they reasonably

- 8 -

believe would cause them harm." AA10. Pinson also seeks nominal damages in the amount of $1.00 and punitive damages in the amount of $1.5 million. AA10.

### B.    District Court Proceedings

In a one-paragraph order dated on the docket January 19, 2010 (*i.e.*, the same date Pinson's complaint was docketed) and entered on January 21, 2010, District Judge Kollar-Kotelly transferred Pinson's case to the U.S. District Court for the Northern District of Alabama. AA2, AA21-22. Judge Kollar-Kotelly evaluated whether venue was proper under 28 U.S.C. § 1391(b), said the District of Columbia was an "improper" venue, and viewed the Northern District of Alabama as the "appropriate judicial district." AA21. The reason given for the transfer was that "none of the alleged events forming the basis of the complaint occurred in the District of Columbia." AA21 (citing 28 U.S.C. § 1391(b)). She transferred the case pursuant to 28 U.S.C. § 1406(a). AA21.

At the time of transfer, Pinson had already filed an application to proceed *in forma pauperis*. In her order, Judge Kollar-Kotelly stated that this application would be decided by the Alabama district court. AA22.

Pinson further maintains that, on either January 11 or January 14, 2010 (thus, before Judge Kollar-Kotelly's transfer order), and then a second time on January 22, 2010, he and numerous other prisoners across the country – including Petitioners Bruce and Leigh, but not so clearly Hobbs and Brown – sought

collectively to file a "Motion For Leave to Join and Amend" to further explicate the national nature of the problems created by SMUs and the impracticality of any venue other than Washington, D.C.[2]  AA70-71, AA106-11.  This motion was, on both occasions, returned by the clerk of the District Court (on January 22 and February 23, 2010, respectively) to Pinson.  AA71, AA107.  Pinson says that, with the final rejection, the clerk "attached a note stating 'nobody can sign motions except parties.'"  AA109.

Pinson moved for reconsideration of the transfer order on January 29, 2010, arguing that the Alabama district court would not have jurisdiction to order relief on his complaint.  AA23.  The motion for reconsideration states:

> Plaintiff's objection [to the transfer] is based upon the fact that several of the defendants are physically located within the District of Columbia and their decisions were made also within the District of Columbia.  The authority to transfer Plaintiff to a prison in Alabama rests with officials in the District of Columbia.  The Northern District of Alabama does not possess jurisdiction to grant injunctive relief against officials in the District of Columbia for actions, customs or policies which originate in Washington, D.C.

---

[2] A brief that Pinson has filed in this Court's proceedings on the mandamus petition states that the Motion For Leave to Join and Amend was signed by the following individuals:  Joe Ramirez, Antoine Bruce, James Chatman, Enrique Chavez, Edwin Guzman, Allen Venezuela, Clifton Hamalowa, Joel Murillo, Richard Blount, Joseph Stevens, Anthony Zaragoza, Shawn Cropp, Matthew Eyre, Ramiro Rosillo, Ramiro Pacheco, John Leigh, Donte Allen, Windzer Fleurissaint, Wayne Jenkins, Donald Rourke, Damarcus Law, Sean Fabian, Randy Atchley, Nathaniel Theris, Chavon Wiggins, and Gary Kornegay.  AA107.  Plus, a separate motion was filed by Bobby Crowley (later murdered, *see supra* p. 6 n.1).  AA107.

AA23-24.  At this time, Pinson's case was not assigned to a specific district court judge, and Judge Henry Kennedy summarily denied Pinson's motion on February 19, 2010.  AA25.

### C.    Proceedings in This Court

Pinson filed a notice of appeal with respect to the transfer order on March 1, 2010.  On March 15, 2010, a panel of this Court indicated that the notice of appeal would be construed as a petition for a writ of mandamus, because "[t]he proper means for contesting such a transfer is a petition for writ of mandamus filed in this court."  AA42 (citing *D.C. Circuit Handbook of Practice & Internal Procedure* III.G.3 (2007)).  It further ordered Pinson to either file a motion to proceed *in forma pauperis* or to pay the $450 docketing fee to the District Court's clerk. AA43.

Pinson did then file a motion to proceed *in forma pauperis* (AA45-52), and he also moved to stay the collection of filing fees in the mandamus case, until he had paid in full the filing fee owed in case number 09-14242-C in the Eleventh Circuit.  AA67-68.   In his motion, Pinson argued that simultaneous collection of fees by this Court and the Eleventh Circuit would violate the PLRA, 28 U.S.C. § 1915(b)(2).   AA67-68.  This Court then held the petition and *in forma pauperis* motion in abeyance pending its resolution of *In re Grant*, No. 08-5440, which

addressed the applicability of the PLRA to a petition for a writ of mandamus. AA69.

While the Court was holding this case in abeyance, Pinson and other inmates, including Hobbs, Brown, Bruce, and Leigh, filed an "Amended Notice of Appeal" in the District Court. AA77-79. The signatories to the Amended Notice state that they are filing a "Notice of Appeal (Amended). . . from the Transfer Order *and* rejection by the Clerk of the Motions for Joinder." AA78 (emphasis added).

On February 28, 2011, following the holding in *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011), that mandamus petitions are subject to the PLRA's filing-fee requirements, this Court returned this matter to its active docket. AA104. A panel of this Court then construed the "Amended Notice of Appeal" as a supplement to the petition for mandamus. AA105. Ultimately, however, the Court dismissed from the proceedings most of the signatories to the supplement to the mandamus petition, for failure to comply with instructions regarding perfecting *in forma pauperis* status. AA231-32. However, Pinson, Hobbs, and Brown had filed the appropriate *in forma pauperis* papers, and this Court kept them as Petitioners. AA187-95, AA202-14, AA200-29, AA196-201. Bruce and Leigh were initially dismissed from the case, but the Court has now reconsidered their dismissal and reinstated them as Petitioners. AA253.

The Court also granted Hobbs and Brown *in forma pauperis* status.  AA232.
But there have been lengthy proceedings on whether Pinson may proceed *in forma pauperis*, and his motion to so proceed remains pending.  In addition to the question of whether to stay collection of the filing fee (due to the Eleventh Circuit case) if he is allowed to proceed *in forma pauperis*, question has arisen as to whether Pinson is disqualified altogether from *in forma pauperis* status because he concededly has had three or more previous cases or appeals dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief could be granted.  *See* 28 U.S.C. § 1915(g).  Pinson has asserted that the PLRA's "imminent danger" exception to the three-strikes rule allows him still to proceed *in forma pauperis*.  AA166-67.

On January 29, 2012, the Court appointed the undersigned as *amicus* to present arguments in Petitioners' favor and directed the parties to address Pinson's *in forma pauperis* motion, Petitioners' "standing to pursue claims concerning the return of pleadings submitted to the district court and the transfer of the case to the Northern District of Alabama," and the merits of the mandamus petition.  AA232.

## STATEMENT OF FACTS

Most of the facts relevant to the motion for *in forma pauperis* status and mandamus petition have been noted (with cites to the record) in the "Statement of the Case" and, in effect, consist of Petitioners' allegations and the factual support

they have so far presented in the limited proceedings in the District Court and here.

We are not aware that Respondents dispute any of these relevant factual

allegations:  Pinson at the time of the complaint was housed in an SMU in FCI

Talladega; the other Petitioners were housed in SMUs in other prisons; Crowley

was murdered and Pinson nearly stabbed while in SMUs; and Respondents are

located in the jurisdictions Pinson listed in his complaint.

  One other fact that Respondents previously have emphasized is that Pinson

no longer is in the SMU at FCI Talladega.  Rather, he currently is an inmate at the

Administrative Maximum Facility in Florence, Colorado.  AA180, 216.

**<u>SUMMARY OF ARGUMENT</u>**

  A.  The Court should grant Pinson's request to proceed *in forma pauperis*

on the mandamus petition.  Though he has three strikes against him for purposes of

application of the PLRA, he falls within the exception for a "prisoner under

imminent danger of serious physical injury."  28 U.S.C. § 1915(g).  Specifically,

Pinson adequately alleges that, at the time of the filing of the complaint and *in*

*forma pauperis* request, he was in serious danger due to being placed in an SMU

with rival gang members, that he is a homosexual housed then with predacious

individuals, and that he was nearly stabbed and another inmate was murdered.

  Upon granting Pinson *in forma pauperis* status, the Court should stay

collection of the filing fee and monthly installment payments, since at least one

- 14 -

other court is currently collecting 20% of his income to cover a filing fee there.
While there is a split in the Circuits as to whether the PLRA's 20% collection
should be a maximum "per prisoner" regardless of the number of filing fees owed
by the prisoner or whether the 20% collection is "per case," this Court's adoption
of the former position is required by *Tucker v. Branker*, 142 F.3d 1294, 1296 (D.C.
Cir. 1998).   Moreover, the per-prisoner approach is more consistent with the
statutory text, its legislative history, and the canon that federal courts should, if
possible, construe statutes so as to avoid constitutional questions.

       B.     Petitioners have standing to challenge the transfer order.  The order
injures Pinson by taking away his choice of forum; the injury is traceable to the
District Court, which answers to the mandamus petition; and Pinson's injury (the
loss of his chosen forum) would be redressed by a favorable decision from this
Court.  Petitioners also have standing to challenge the clerk's rejection of their
Motion for Leave to Join or Amend.  Most notably, the clerk's refusal to present
the document to a District Judge injured them by thwarting their attempt to expand
the scope of the case and both illustrate to the District Court the national nature of
the matter and reinforce the complaint's focus on official prison policies.

       C.     Mandamus relief is appropriate to vacate the transfer order.  The
District Court committed patent legal error by applying the wrong venue statute to
some claims – with the right one being 28 U.S.C. § 1391(e), under which venue

- 15 -

was plainly proper in the District of Columbia, rather than 28 U.S.C. § 1391(b), under which the District Court said venue was altogether improper.  And there is no other adequate remedy to correct the improper transfer, other than mandamus.  For instance, the Eleventh Circuit (the Circuit overseeing the transferee court) would not review an order from a district court outside of its Circuit.  Nor could Pinson likely overcome a defense in an appeal to the Eleventh Circuit that the improper transfer constituted harmless error.

The writ also should issue to direct the clerk of the District Court to present to a District Judge the Motion For Leave to Join or Amend.  Under Fed. R. Civ. P. 5(d)(4), the clerk "must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice."  Only a District Judge can reject filings.  The clerk therefore usurped the District Judge's authority and the clerk's action can be corrected via mandamus.

## **ARGUMENT**

### I.    STANDARD OF REVIEW

Pinson's motion to proceed *in forma pauperis* is an original matter in this Court, and therefore does not involve any standard of review of a district court (or agency) order.  Likewise, a mandamus petition is an original action in this Court, albeit an action to correct a district court's substantial error.  We note the legal

standards for issuance of the writ when later addressing the merits of the

mandamus petition.

## II. THE COURT SHOULD GRANT PINSON'S MOTION TO PROCEED *IN FORMA PAUPERIS* AND STAY COLLECTION OF THE FILING FEE

### A. Because Pinson Adequately Alleged in His Complaint that He Was in Imminent Danger of Serious Physical Injury, He Overcomes the PLRA's "Three Strikes" Rule

The PLRA amended the *in forma pauperis* statute "with respect to suits filed

by prisoners." *Tucker v. Branker*, 142 F.3d 1294, 1296 (D.C. Cir. 1998). "The

purpose of the Act was to require all prisoner-litigants to pay filing fees in full,

with the only issue being whether the inmate pays the entire filing fee at the

initiation of the proceeding or in installments over a period of time." *Ashley v.*

*Dilworth*, 147 F.3d 715, 716 (8th Cir. 1998). The PLRA also bars a prisoner from

using the installment-payment method in any civil action or appeal in federal court

if, while incarcerated, he has filed at least three prior cases or appeals that were

dismissed as frivolous, malicious, or for failure to state a claim upon which relief

can be granted. 28 U.S.C. § 1915(g); *see In re Kissi*, 652 F.3d 39, 40 (D.C. Cir.

2011). This section, "referred to as the 'three strikes rule,'" *Ibrahim v. District of*

*Columbia*, 463 F.3d 3, 6 (D.C. Cir. 1999), "does not close the courthouse doors to

prisoners who frequently file frivolous lawsuits; rather, it merely makes them pay

the full ordinary filing fees sooner rather than later." *Ashley*, 147 F.3d at 717.

This Court has held that the PLRA's strictures apply with full force to petitions for writs of mandamus. *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011).[3]

But there is an exception to the three strikes rule. Even if a prisoner has three strikes, he will be permitted to proceed *in forma pauperis* – that is, he may pay the filing fees in installments rather than up front – if he "is under imminent danger of serious physical injury" at the time he files suit. 28 U.S.C. § 1915(g). This exception "eases any constitutional tension that might result from denying access to the courts to prisoners facing life-threatening conditions." *Mitchell v. Fed. Bureau of Prisons*, 587 F.3d 415, 420 (D.C. Cir. 2009).

The PLRA does not define "imminent danger." *See id.*; *Ibrahim*, 463 F.3d at 6. In one decision, this Court has held that "failure to provide adequate treatment of Hepatitis C, a chronic and potentially fatal disease, constitutes 'imminent danger,'" in an instance where the prisoner is challenging lack of adequate medical care; but it otherwise has not "resolve[d] the precise contours" of what "imminent danger" means. *Ibrahim*, 463 F.3d at 6-7. That said, this Court has held that for "danger" to qualify as "imminent," a petitioner must allege an "ongoing threat" at the time of the filing of the complaint. *Mitchell*, 587 F.3d at 421.

_____

[3] Other Circuits disagree with *In re Grant*, holding that mandamus petitions are not subject to the PLRA. *See In re Grant*, 635 F.3d at 1230 n.2 (noting competing cases). Petitioners preserve, if necessary, for further review the issue of the PLRA's application to mandamus petitions.

The PLRA also fails to define what constitutes a "serious physical injury." *See* 28 U.S.C. § 1915(g); *Ibrahim*, 463 F.3d at 7.  In *Ibrahim*, this Court had "no difficulty concluding that a chronic disease that could result in serious harm or even death constitutes 'serious physical injury.'"  *Ibrahim*, 463 F.3d at 7.  However, the Court has not clarified the term's meaning in other contexts.

Pinson concedes that he has accumulated at least three strikes.  AA166.  Therefore, Pinson may proceed *in forma pauperis* only if he qualifies under the imminent danger exception.

Importantly, to make that determination, this Court "assess[es] the alleged danger *at the time [petitioner] filed his complaint* " and should look to "the documents attesting to the facts at that time, namely his complaint and the accompanying motion for IFP status."  *Mitchell*, 587 F.3d at 420 (emphasis added). In addition, the Court must construe Pinson's *pro se* allegations with respect to any imminent danger he faces liberally and accept – for purposes of the *in forma pauperis* determination – his factual allegations as true.  *Ibrahim*, 463 F.3d at 6. And still further in Pinson's favor, his complaint is not subject to the pleading standard the Supreme Court set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), because proceedings to determine *in forma pauperis* status "are nonadversarial and implicate none of the discovery concerns lying at the heart of" *Iqbal*.  *Mitchell*, 587

- 19 -

F.3d at 420.  His allegations simply must avoid being "vague and unspecific."  *Id.*

at 422.[4]

On the merits of the imminent danger issue presented by Pinson, *Ashley* is

instructive.  In *Ashley*, the Eighth Circuit found a petitioner to be in imminent

danger of serious physical injury when he was placed near, and ultimately attacked

by, inmates on his "enemy list."  147 F.3d at 717.  The petitioner in *Ashley* notified

prison officials that he had been placed near inmates on his enemy list.  *Id*.  The

officials subsequently threatened to transfer the petitioner to place him near a

---

[4] Because the Court reviews the situation at the time the complaint and *in forma pauperis* papers were filed, Respondents are wrong to assert that the BOP's later movement of Pinson to a different prison, from the SMU at FCI Talladega, disposes of his *in forma pauperis* motion.  *See* AA180.   To allow *in forma pauperis* status to be altered by any changes in circumstances after the filing of the complaint and *in forma pauperis* motion impermissibly would result in constant reassessment of the status and thus wasted litigation resources; instead, Congress has invited re-examination only if "the court determines that . . . the allegation of poverty is untrue."  28 U.S.C. § 1915(e)(2).  Indeed, incongruous results would ensue:  a prisoner who had no strikes against him at the start of his case and had been granted *in forma pauperis* status might then lose the ability to proceed with the matter if he obtained three strikes during the case's pendency; or a prisoner who is discharged during the pendency of his action and had been denied *in forma pauperis* status at the start of his action due to three strikes would suddenly become eligible to proceed *in forma pauperis* now as a non-prisoner.  *See In re Smith*, 114 F.3d 1247, 1249 (D.C. Cir. 1997).  Moreover, if changes in circumstances post-complaint were determinative, prison officials would regularly have it within their power to alter *in forma pauperis* status by, for instance, temporarily altering prison conditions to remove the alleged dangers, thereby potentially ensuring that important cases reviewing their actions cannot go forward.

known enemy, intending that he would be harmed. *Id*. And he *was* harmed when he was attacked twice by the same enemy, once with a sharpened screwdriver and on another occasion with a butcher knife. *Id*.

Another illustrative decision is *Renoir v. Governor of Virginia*, 755 F. Supp. 2d 82 (D.D.C. 2010), where Judge Lamberth granted a prisoner's application to proceed *in forma pauperis* based on the imminent danger exception. The prisoner there alleged that his cellmate had multiple homemade knives that he planned to use to kill the petitioner, that prison officials were aware of the danger, and that the officials did nothing because they hoped petitioner would be killed. 755 F. Supp. 2d at 85.

Viewing Pinson's allegations "through the forgiving lens applicable to pro se pleadings," *Mitchell*, 587 F.3d at 422, he has adequately alleged that he faced an imminent danger of serious physical injury at the time of the filing of the complaint and *in forma pauperis* motion in this Court. The complaint alleges that Pinson was placed in the SMU at FCI Talladega; that he is a former member of the Sureno gang; that the SMU at FCI Talladega houses inmates who have participated in gang-related activity and who have vowed to kill or injure rival gang members; that hundreds of inmate-on-staff and inmate-on-inmate attacks have occurred in the SMU, along with several hostage situations and suicides; that certain BOP officials were notified of each such incident (and therefore were aware of the violence in the

SMU), but failed to take reasonable steps to prevent further violence or to separate rival gangs; and that certain BOP officials knew that Pinson was a former member of the Sureno gang, but failed to properly identify him as such and failed to separate him from his known enemies; and that he was housed with rival inmates and faced life-threatening conditions.  AA7-8.  Pinson has added that "Bobby Crowley was murdered by a rival gangmember on Aug. 3, 2010" and that Pinson himself "was nearly stabbed on Jan. 9, 2011."  AA167.

Pinson, who notes that he is a homosexual, has also alleged that certain BOP officials knew he is homosexual, that he faced a substantial risk of harm by being placed in an SMU because "violent, predacious" inmates were assigned there as well, and that the BOP officials placed him in the SMU at FCI Talladega anyway. AA8.

Thus, Pinson alleged that – whether because he is a former gang member housed with rival gang members or because he is homosexual among predacious individuals – that he was in grave danger of "serious physical injury," *i.e.*, being attacked, being taken hostage, or even being killed.  At the time his complaint and *in forma pauperis* request were filed, this danger was "imminent," for he was housed in the SMU at FCI Talladega with inmates who were not only violent, but specifically targeted him based on gang affiliation and/or his sexual orientation. Indeed, the violence Pinson feared then did occur when he was nearly stabbed.

Similar to the circumstances in *Ashley* and *Renoir*, prison officials (Respondents in this case) knew of the danger Pinson faced by being placed in the SMU, and not only did nothing to avoid that danger but affirmatively chose to place him in harm's way. Accordingly, just as the prisoners did in those cases, Pinson has satisfied his burden to allege sufficiently imminent danger of serious bodily injury.

### B. The Court Should Stay Collection of the Filing Fee Pinson Owes Because the PLRA Imposes a 20% "Per Prisoner" Cap

Pinson's motion to stay the collection of his appellate filing fee presents a vexing question regarding interpretation of 28 U.S.C. § 1915(b)(1) and (2). The statutory text of § 1915(b)(1) provides:

> [I]f a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of –
>
> > (A) the average monthly deposits to the prisoner's account; or
> >
> > (B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

28 U.S.C. § 1915(b)(1). After the initial partial payment, § 1915(b)(2) governs, providing that:

> the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each

time the amount in the account exceeds $10 until the filing fees are paid.

*Id.* § 1915(b)(2).

The thorny question is whether 28 U.S.C. § 1915(b) imposes a total cap of 20% to be taken from a prisoner's monthly income regardless of the number of cases or appeals filed, or whether the statute permits 20% to be taken each month for each case or appeal that the prisoner files. That is, should Pinson's multiple encumbrances be collected sequentially (waiting until the oldest encumbrance is fully satisfied before starting to collect the next) or simultaneously (taking 20% per case each month)?

There is a split of authority on the issue among the Circuits: the Second and Fourth Circuits have adopted a sequential (or "per-prisoner") approach, holding that § 1915(b) imposes a 20% cap, regardless of the number of cases for which the prisoner is indebted; a prisoner pays 20% of his income each month toward one filing fee until that fee is paid in full, then the process is repeated until all such obligations are fulfilled. The Fifth, Seventh, Eighth, and Tenth Circuits have adopted a simultaneous (or "per-case") scheme, interpreting the statute to require prisoners simultaneously to pay 20% of their funds each month toward each outstanding filing fee, even if this means that 100 percent of a prisoner's income is collected. *Compare Whitfield v. Scully*, 241 F.3d 264, 278 (2d Cir. 2001) (per-prisoner approach); *Torres v. O'Quinn*, 612 F.3d 237, 240 (4th Cir. 2010) (same)

with *Atchison v. Collins*, 288 F.3d 177, 180 (5th Cir. 2002) (per-case approach); *Newlin v. Helman*, 123 F.3d 429, 436 (7th Cir. 1997) (same), *overruled in part on other grounds by Lee v. Clinton*, 209 F.3d 1025 (7th Cir. 2000) *and Walker v. O'Brien*, 216 F.3d 626 (7th Cir. 2000); *Lefkowitz v. Citi-Equity Group, Inc.*, 146 F.3d 609, 612 (8th Cir. 1998) (same); *Christensen v. Big Horn County Bd. Of County Comm'rs*, 374 F. App'x 821, 833 (10th Cir. 2010) (same).

For several reasons, the Court should follow the Second and Fourth Circuits' 20% per-prisoner approach.

### 1. This Court Has Already Adopted a 20% Per-Prisoner Cap

The issue has already been decided in this Circuit in Pinson's favor as a result of *Tucker v. Branker*, 142 F.3d 1294 (D.C. Cir. 1998). In *Tucker*, the prisoner presented what was, in effect, a challenge to the PLRA's filing fee requirement, contending that "the fee requirement denies Tucker due process of law by forcing him to choose between filing a lawsuit and being able to buy the necessities of life." *Id.* at 1298. Rejecting that charge, this Court said (among other things) that "Tucker's claim that the *minimal* payments required by the PLRA force him to choose between a lawsuit and the 'necessities of life' is manifestly exaggerated.'" *Id.* (emphasis added). Explaining its point, the Court said: "[A] prisoner with only modest means must make only a proportionately modest up-front payment – 20% of the average monthly deposits or balance in his

account over a six-month period.  Whether the prisoner paid some or none of the

fee upon filing, the balance due is collected from him at the 20% rate only when

and if 'the amount in [his] account exceeds $10.'"  *Id.*  Of greatest significance, the

Court then added:  "[T]he payment requirement of *the PLRA never exacts more*

*than 20% of an indigent prisoner's assets or income*."  *Id.* (emphasis added).   On

this basis, the Court concluded that the PLRA could not be seen as "unduly

burdening [Tucker's] access to court."  *Id.*

     The Court also distinguished *In re Green*, 669 F.2d 779 (D.C. Cir. 1981),

which had declared unconstitutional a district court's requirement that "the

indigent plaintiff to pre-pay not only the full filing fee but also a $100 deposit

against costs he might be assessed."  *Tucker*, 142 F.3d at 1299.  The *Tucker* Court

said *In re Green* was inapposite because "[t]he percentage-based scheme of the

PLRA is, as we have seen [*i.e.*, as already described by the Court], much less

burdensome and for that reason constitutional."  *Id.*; *see also id.* (distinguishing

Supreme Court access-to-courts cases because "the filing-fee provision of the

PLRA does not present the sort of *insurmountable* barrier to filing suit considered

in those cases") (emphasis added; internal quotation marks omitted).

     In light of *Tucker*'s holding and reasoning, the Court must adopt the per-

prisoner approach, setting the upper limit of the amount taken from the prisoner in

any given month at 20%.  To find the statute constitutional in the face of a

challenge that it forces a Hobson's Choice between accessing the courts and affording basic necessities, the Court in *Tucker* had to find, and did find, that the PLRA's take from a prisoner is, in relative terms, "minimal" and, in fact, "never" more than 20% of his assets. *Id.* at 1298. Not only would the opposite view (*i.e.*, the per-case approach, allowing potentially for a full 100% collection) have left the Court with no basis for saying funds remained for bare necessities, it would have meant no ground for distinguishing *In re Green* as more "extreme." *Id.* at 1299.

    In light of *Tucker*, the Fourth Circuit has commented that this Court "would follow the Second Circuit's approach." *Torres*, 612 F.3d at 242 n.3. But the Fourth Circuit said "would follow," rather than simply "follows," the Second Circuit's approach, because the Fourth Circuit viewed as "*dicta*" this Court's statement that the "'payment requirement of the PLRA *never* exacts more than 20% of an indigent prisoner's assets or income.'" *Id.* (quoting *Tucker*, 142 F.3d at 1298) (emphasis added by Fourth Circuit). Yet, in this Circuit, "dictum refers to reasoning that does not support the holding of a case," as opposed to "reasoning (whether correct or not) [that] directly supports [a] holding." *Parker v. District of Columbia*, 478 F.3d 370, 396 n.16 (D.C. Cir. 2007). Here, *Tucker*'s finding that the PLRA never takes more than 20% of a prisoner's assets not only supports the

Court's holding of constitutionality, but was a "critical factor" in it.  *Taylor v. U.S. Dep't of Agric.*, 629 F.3d 241, 251 (D.C. Cir. 2011).[5]

**2.    The PLRA's Text and Legislative History Favor the Per-Prisoner Approach**

Even if the Court were to find that *Tucker* did not already decide the question, the Second and Fourth Circuits' per-prisoner approach remains the better position because the text and structure of the PLRA favor it.  For the most part, the courts have determined that the text of § 1915(b) does not straightforwardly dictate, and is instead silent, as to whether multiple filing fee encumbrances should be collected sequentially or simultaneously.  *Torres*, 612 F.3d at 243-44; *Whitfield*,

---

[5] A different aspect of *In re Green* no longer survives.  In *Hurt v. Social Security Administration*, 544 F.3d 308 (D.C. Cir. 2008), the Court overruled (based on intervening Supreme Court precedent) *In re Green*'s requirement that a court "determine 'separately in every case' whether to allow a litigant to proceed *in forma pauperis*."  *Id.* at 310 (quoting *In re Green*, 669 F.2d at 786).  *Hurt* did not, however, disturb *In re Green*'s holding that, "[a]part from the necessity of a case-by-case determination of poverty, frivolity or maliciousness, a court may impose conditions upon a litigant – even onerous conditions – so long as they assist the court in making such determinations, and so long as they are, taken together, not so burdensome as to deny the litigant meaningful access to the courts."  *In re Green*, 669 F.2d at 786.  In any event, the relevant point is that, when *Tucker* was decided, the Court there needed to distinguish *In re Green* and did so by construing the PLRA as never requiring greater than 20% of a prisoner's assets, thereby foreclosing a contrary position here.  Finally, even if the pertinent parts of *Tucker* actually were *dicta*, this Court would still be constrained to interpret the PLRA as limiting filing fee collections to 20% in total per prisoner, in alignment with *In re Green*'s still-extant holding that there cannot be overly burdensome constraints on an individual's access to the courts.

241 F.3d at 276; *Newlin*, 123 F.3d at 436.   But still, there is one textual indication in the PLRA pointing toward the per-prisoner approach.

In this regard, the "most valuable interpretive clue" in the statute's text is § 1915(b)(1)'s reference to the initial partial payment of 20% being a "'payment of *any* court fees.'"  *Torres*, 612 F.3d at 245 (quoting 28 U.S.C. § 1915(b)(1)) (emphasis added by Fourth Circuit).  The use of the word "any" by Congress "suggests that the twenty percent exaction applies to *all* court fees, in total."  *Id.* at 245 (emphasis added); *accord Whitfield*, 241 F.3d at 276.  To this effect, this Court has interpreted the word "any" broadly.  *See, e.g.*, *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 134 (D.C. Cir. 2012) (holding that the phrase "any air pollutant" in the Clean Air Act "includes *all* regulated air pollutants") (emphasis in original); *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) ("'Any,' after all, means any"); *see generally United States v. Gonzales*, 520 U.S. 1, 5 (1997) (explaining that "any" has "expansive meaning" and finding that, because "Congress did not add any language limiting the breadth of that word," the Court could not impose a limit).

Likewise, the PLRA's legislative history supports the per-prisoner approach.  Until 1996, the *in forma pauperis* statute provided that any person prisoner or not – without means could commence a suit without prepaying the requisite filing fees.  In adding the new rules for prisoners in 1996, "Congress

'endeavored to reduce frivolous prisoner litigation by making all prisoners seeking to bring lawsuits or appeals feel the deterrent effect created by liability for filing fees.'" *In re Smith*, 114 F.3d 1247, 1249 (D.C. Cir. 1997) (quoting *Leonard v. Lacy*, 88 F.3d 181, 185 (2d Cir. 1996)).

Yet, while Congress sought to provide initial deterrents against suits, it also understood "that a 'chilling effect' on litigation was not the same as a complete bar on filing suits, which may occur if close to one hundred percent of an inmate's income is taken to pay his filing fees" (such as if 20% per-case exactions occurred and an inmate had outstanding filing fees for five cases). *Torres*, 612 F.3d at 247. Several Senators indicated that Congress did not intend to impose a complete bar on prisoner litigation (again, the logical extreme of the per-case approach). *See*, *e.g.*, 142 Cong. Rec. S2226 (daily ed. Mar. 18, 1996) (Sen. Reid stating that, "[i]f somebody has a good case, a prisoner, let him file it."); 141 Cong. Rec. S14626 (daily ed. Sept. 29, 1995) (Sen. Hatch stating that he did not "want to prevent inmates from raising legitimate claims"); 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (Sen. Kyl stating that "[t]he filing fee is small enough not to deter a prisoner with a meritorious claim, yet large enough to deter frivolous claims and multiple filings.").

Moreover, the legislative history suggests that Congress did not intend to dissuade prisoner litigation with the timing of the payment. Instead, Congress

intended to deter meritless lawsuits with the fact of the payment itself. *See* 141 Cong. Rec. S14413 (daily ed. Sept. 27, 1995) (Sen. Dole stating that "when prisoners know that they will have to pay these costs – perhaps not at the time of filing, but eventually – they will be less inclined to file a lawsuit in the first place.").

The simultaneous, or "per case," scheme ignores these Congressional intentions:

> Under the [per-case] approach, an inmate could file three lawsuits in district court, all of which present colorable and plausible, but ultimately losing, claims. If the district court grants summary judgment against the inmate in each case, the inmate would be fore-closed from pursuing what could be a meritorious appeal in the third case because the three district court filing fees (60%) coupled with the filing fees for the appeals in the first two cases (40%) would exhaust his trust fund account and he could not pay the appellate filing fee, and therefore could not appeal, the adverse summary judgment in the third case. Congress could not possibly have intended this outcome; certainly, federal courts should not provide this answer to a question that Congress never thought about.

*Torres*, 612 F.3d at 247.[6]

### 3. The Court Should Adopt the Per-Prisoner Approach Because It Avoids Constitutional Problems

A final reason for adopting the per-prisoner approach is that it – unlike the per-case approach – avoids constitutional issues. Again, if the PLRA is "read to

---

[6] That Congress never intended to collect 100% of a prisoner's monthly income is expressly reflected in the requirement that only when a prisoner's account exceeds $10 does the 20% payment system apply.

require recoupment on a per-encumbrance basis," doing so potentially exposes "100 percent of a prisoner's income to recoupment." *Whitfield*, 241 F.3d at 276. Thus, any prisoner who has five encumbrances against him – say, filing fees for three complaints and two appeals – would be subject to collection of his entire income, with nothing to spare for further access to the courts (let alone bare necessities). "[T]his result arguably could pose a serious constitutional quandary as to whether an unreasonable burden had been placed on the prisoner's right of meaningful access to the courts." *Id.* at 277; *see also Tucker*, 142 F.3d at 1297 (holding that "[p]risoners have the right, as a matter of due process, to adequate, effective, and meaningful access to the courts").

The Seventh Circuit, in adopting the simultaneous, per-case scheme, did not have similar concerns, reasoning that under the per-prisoner approach, "a prisoner could file multiple suits for the price of one, postponing payment of the fees for later-filed suits until after the end of imprisonment (and likely avoiding them altogether)." *Newlin*, 123 F.3d at 436. The Seventh Circuit also believed that "unless payment begins soon after the event that creates the liability," the prisoner will avoid "bearing some marginal cost for each legal activity," thus frustrating the statute's objective. *Id.* The Seventh Circuit added that the cumulative, per-case approach also led to the same result (100% collection of prisoner funds) that would soon occur anyway: "Five suits or appeals mean that the prisoner's entire monthly

- 32 -

income must be turned over to the court[s] until the fees have been paid – though

by then a prisoner is likely to have three strikes and owe all future filing fees in

full, in advance." *Id.*

The Seventh Circuit's rationale is ultimately unpersuasive. That court's

reasoning requires

> a number of highly debatable assumptions: (1) that prisoners only file
> suits that are "frivolous," "malicious," or "fail to state a claim upon
> which relief can be granted," *see* 28 U.S.C. § 1915A(b)(1); (2) that
> most prisoners who file numerous suits are serving relatively short
> sentences, and thus will be released before all unpaid filing fees can
> be collected from their trust accounts; and (3) that Congress is
> powerless to collect unpaid filing fees from prisoners after they are
> released.

*Torres*, 612 F.3d at 244. As to the latter two points, this Court has expressly held

that "release from prison does not relieve [a former prisoner] of past due

obligations under the PLRA." *In re Smith*, 114 F.3d 1247, 1249 (D.C. Cir. 1997).

Furthermore, as the Second Circuit has explained, while a delay in payments

"may create less of an incentive for prisoners not to litigate, that alternative is far

preferable to adopting a construction of the statute that could render it

unconstitutional." *Whitfield*, 241 F.3d at 277. All federal courts must "avoid an

interpretation of a federal statute that engenders constitutional issues if a

reasonable alternative interpretation poses no constitutional question." *Gomez v.*

*United States*, 490 U.S. 858, 864 (1989). "Here, there is such a reasonable

alternative" (*Whitfield*, 241 F.3d at 277): the recoupment of multiple

- 33 -

encumbrances in sequential fashion at a constant rate of 20% of monthly receipts

to a prisoner's account.[7]

## III. PETITIONERS HAVE STANDING TO CHALLENGE THE TRANSFER ORDER AND THE REJECTION OF PLEADINGS

The Court has asked the parties and *amicus* to address the Petitioners'

standing to challenge both the District Court's transfer of the case to Alabama and

the District Court clerk's rejection of filings. The doctrine of standing requires

"federal courts to satisfy themselves that the plaintiff has alleged such a personal

stake in the outcome of the controversy as to warrant his invocation of federal-

court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)

(internal quotation marks and citations omitted). To have standing under Article

III of the Constitution, a plaintiff must establish: "(1) it has suffered an 'injury in

---

[7] The Seventh Circuit's approach also suffers from the problem that eventually the approach undermines its own concern for prisoners avoiding payment for their filings. Let's say that a prisoner currently has five cases pending, and therefore all of the prisoner's assets are encumbered for the 20% monthly payments. That prisoner could now file new cases (potentially innumerable new cases), free of charge. This is because the initial filing fee for the new cases would be 20% of the account balance, which is zero, and "[i]n no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee." 28 U.S.C. § 1915(b)(4). When the monthly installment payments then come due, the prisoner would not owe any of them with 100% of his account already encumbered, given that the installment payments are to occur only if "the amount in the account exceeds $10." *Id.* § 1915(b)(2). The per-prisoner approach avoids this anomaly by lining up all filing fees sequentially and requiring steady payment of them until all obligations are satisfied.

fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  A court need only satisfy itself that one plaintiff has standing to pursue the claims at issue.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 and n.9 (1977) ("[W]e have at least one individual plaintiff who has demonstrated standing to assert these rights as his own . . . . [W]e need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.").

Pinson plainly satisfies these standards with respect to his challenge to the transfer.  First, with respect to the requirement that he must have suffered a "concrete and particularized injury" (*Florida Audubon Society v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citation omitted)), he must – because he seeks mandamus relief from *the District Court's actions* – demonstrate injury from those actions.  *Cf. Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1018 (D.C. Cir. 1998)  ("The most obvious difference between standing to appeal and standing to bring suit is that the focus shifts to injury caused by the judgment rather than injury caused by the underlying facts.").  Here, the transfer concretely injures Pinson

because it takes away his choice of forum in a case he commenced and seeks to prosecute.  He is entitled to litigate where he chooses, unless there is a valid basis for transfer (or, of course, unless there were a jurisdictional impediment to litigating in his chosen forum).  *See Gross v. Owen*, 221 F.2d 94, 95 (D.C. Cir. 1955) ("[i]t is almost a truism that a plaintiff's choice of a forum will rarely be disturbed"); *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1168-69 (7th Cir. 1969) (discussing "the right of a personal injury plaintiff to choose the forum and the time, if at all, to assert his claim").

Second, the injury he asserts – namely, the wrongful transfer of his case – is not just fairly traceable, but entirely traceable, to the District Court, against whom the mandamus petition is aimed.  The District Court, and only the District Court, could transfer the case.  When this Court then converted Pinson's appeal to a mandamus petition, the Court effectively made the District Court and its actions (of its clerk) the focus of the case.  A "mandamus proceeding . . . is a free standing cause of action, brought . . . against the district judge."  *In re Stewart*, 641 F.3d 1271, 1274 n.9 (11th Cir. 2011) (internal quotation marks omitted).

Third, it is likely Pinson's injury will be redressed by a favorable decision of this Court on the mandamus petition.  The writ issued by the Court would instruct the nullification of the transfer order and the exercise of jurisdiction by the District Court.

- 36 -

Pinson also has standing to challenge the clerk's refusal to docket the "Motion to Join and Amend." Most notably, Pinson suffered concrete injury by the wrong (*i.e.*, the failure to docket) because he was denied access to the federal courts. *See, e.g., Ex parte Hull*, 312 U.S. 546, 549 (1941) ("the state and its officers may not abridge or impair petitioner's right to apply to a federal court"). Moreover, Pinson contends that the pleading – because the document spoke on behalf of numerous prisoners, not just himself – showed the extensive, nationwide problem caused by the creation of SMUs. Because the clerk prevented a District Judge from ever seeing this document by failing to accept it, Pinson was harmed in his efforts to convince the District Court of the propriety of venue in the District of Columbia, the place where the challenged SMU policy causing nationwide injuries was formulated. *See* AA110 ("This case involves plaintiffs in Alabama, Colorado, Louisiana, Pennsylvania, Oregon, Arizona, Mexico [sic: New Mexico]. It involves a federal agency and several defendants in Washington, D.C. and Alabama and Texas. . . . [H]ad the Court filed the Motions rather than arbitrarily rejecting them[,] an Amended Complaint would clearly show that D.C. was an appropriate venue.").

Pinson also satisfies the other requirements for standing with respect to his challenge to the clerk's failure to file documents. Pinson's injury (*i.e.*, inability to get his motion docketed) is exclusively traceable to the clerk, and the District

Court and its clerk are reachable in a mandamus proceeding in this Court. And an order from this Court would plainly redress Pinson's injury, since the Court would compel the clerk to present to a District Judge (to determine whether to docket or to reject) the refused filings.

Whether the other Petitioners have standing to challenge either the transfer order or the failure to accept documents is more complicated, but this Court need not reach their standing once it finds that Pinson has standing (assuming his petition is not squelched by an inability to proceed *in forma pauperis*). In any event, proceeding to consider their standing, it may appear that all Petitioners except Pinson lack standing to challenge the transfer order, since they were not parties to the case at the time of the transfer. Still, while, "[a]s a general rule, only a party of record in a lawsuit has standing to appeal from a judgment of the district court," there is "an exception to this rule when the nonparty has an interest that is affected by the trial court's judgment." *Aurelius Capital Partners, LP v. Republic of Arg.*, 584 F.3d 120, 127 (2d Cir. 2009) (internal quotation marks omitted). Here, if there is an impediment to Pinson pursuing mandamus to overturn the transfer order, the other Petitioners (even as non-parties below) might be able to establish standing, on the grounds that they have an interest in the lawsuit challenging SMU procedures (witnessed, in fact, by their effort to join the action) and in salvaging the lawsuit's continuation in the best possible forum.

- 38 -

The remaining Petitioners have an even stronger basis for standing to challenge by mandamus the clerk's failure to accept documents. Though the record is less than clear as to the relevant events, and the rejected motion (or motions) is not contained anywhere in the record, the facts read most charitably in these Petitioners' favor convey that they sought to register their intention to enter the case, albeit perhaps through an inartful statement "to join" rather than to intervene. *See* Fed. R. Civ. P. 24. The clerk's decision to reject the filing denied, without any judicial consideration, these Petitioners the right to express this intention and the opportunity to become parties to this action. This is not to say that, once the motion had been accepted and sent to a Judge, the District Court would necessarily have permitted anyone to join, to intervene, or to amend the complaint, or that the District Court would have found the motion acceptable for consideration. However, the question for present purposes is one of standing – and thus whether Hobbs, Brown, Bruce, and Leigh were injured. The clerk's actions negated their effort (correct in form or not) to assist in converting the case into essentially a "class action" type of suit, thereby causing them harm. AA203.

## IV.   THE COURT SHOULD ISSUE A WRIT OF MANDAMUS TO VACATE THE TRANSFER ORDER AND TO DIRECT THE CLERK TO PRESENT TO A DISTRICT JUDGE THE REJECTED FILINGS

The final set of issues concerns whether, in fact, the Court should on the merits issue a writ of mandamus. Of course, the "remedy of mandamus is a drastic

- 39 -

one, to be invoked only in extraordinary situations." *Kerr v. United States Dist. Court for Northern Dist. of Cal.*, 426 U.S. 394, 402 (1976) (citations omitted). "[T]he writ 'has traditionally been used in the federal courts only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.'" *Id.* (quoting *Will v. United States*, 389 U.S. 90, 95 (1967)). And it is "meant to be used only in the exceptional case where there is clear abuse of discretion or usurpation of judicial power of the sort held to justify the writ in." *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953) (internal quotation marks and citations omitted).

Accordingly, the writ will issue "upon the satisfaction of three conditions: there must be 'no other adequate means to attain the relief [the petitioner] desires'; 'the petitioner must satisfy the burden of showing that [its] right to issuance of the writ is clear and indisputable'; and 'the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.'" *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 668 F.3d 724, 729-30 (D.C. Cir. 2012) (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004) (alterations in original)).

Notwithstanding the petitioner's burden for mandamus, "this circuit has frequently exercised its mandamus jurisdiction to vacate transfer orders, especially where the transfer was beyond the district court's power." *In re Sealed Case No.*

- 40 -

*98-5062*, 141 F.3d 337, 340 (D.C. Cir. 1998); *see also In re Briscoe*, 976 F.2d 1425, 1427 (D.C. Cir. 1992); *In re Scott*, 709 F.2d 717, 719 (D.C. Cir. 1983). Mandamus might also issue to vacate a transfer order when a district court "failed to consider the applicable statutory criteria . . . or transferred the case without providing a hearing." *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 (D.C. Cir. 1992); *see also id.* (for mandamus to issue, court considers whether there was an "abuse of judicial authority"); *In re Apple, Inc.*, 602 F.3d 909, 911 (8th Cir. 2010) ("a clear error of law or clear error of judgment leading to a patently erroneous result may constitute a clear abuse of discretion" for purposes of mandamus).

The inquiry here is whether, under these standards, the Court should issue the writ to block the District Court's transfer of the complaint to Alabama or to direct the clerk to present to a District Judge the filings it rejected so the Judge may determine whether to accept or reject the filings. As we show below, the test for mandamus is satisfied on both fronts.

**B.    Mandamus Is Appropriate to Vacate the Transfer Order**

> **1.  The District Court Applied the Wrong Venue Criteria and Otherwise Abused Its Judicial Authority in Transferring the Case**

The District Court committed clear legal error and thereby abused its judicial authority in transferring the case because it applied the wrong venue statute. It held venue to be improper under 28 U.S.C. § 1391(b), the general venue statute,

when venue was in fact proper under 28 U.S.C. § 1391(e), the venue statute

pertaining to cases against federal officials.  More specifically, venue for at least

some of Pinson's claims is properly evaluated under 28 U.S.C. § 1391(e), since his

complaint includes claims for declaratory and injunctive relief brought against

federal defendants acting in their official capacity.

Section 1391(e) provides that "[a] civil action in which a defendant is an

officer or employee of the United States or any agency thereof acting in his official

capacity or under color of legal authority, . . . may . . . be brought in any judicial

district in which . . . *a* defendant in the action resides."  28 U.S.C. § 1391(e)

(emphasis added).  In turn, "'[w]here a public official is a party to an action in his

official capacity he resides in the judicial district where he maintains his official

residence, that is where he performs his official duties.'"  *Nestor v. Hershey*, 425

F.2d 504, 521 (D.C. Cir. 1969) (quoting 1 J. W. Moore, Federal Practice ¶ 0.142

[5.-2] (1964)).  Respondents Harley G. Lappin, Director of the BOP, and Joyce K.

Conley, the Assistant Director of the Correctional Programs Division (or their

successors) reside in the District of Columbia, making venue for this action

properly laid in the District of Columbia (*i.e.*, *"a* defendant" resides here).[8]

---

[8] The *amicus* notes that some of the officials named in Pinson's complaint might  no
longer be in office and their successors may be automatically substituted in this
case, to the extent the suit is brought against these federal officials in their official
capacities.  *See* Fed. R. App. P. 43; *Nat'l Ass'n of Home Builders v. Norton*, 415

(footnote continued on next page)

Additionally, the Supreme Court explained, in *Stafford v. Briggs*, 444 U.S. 527 (1980), that § 1391(e) particularly covers claims "against a federal official or agency who is at that time acting – or failing to act – in an official or apparently official way." *Id.* at 536. "[T]he intended thrust of § 1391(e) [is] to mandamus-type actions" (*id.* at 540) – that is, suits "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. This venue statute was enacted "to provide nationwide venue for the convenience of individual plaintiffs in actions which are nominally against an individual officer but are in reality against the Government." *Stafford*, 444 U.S. at 542.

In a similar vein, this Court has stated that claims for declaratory and injunctive relief against federal officials are contemplated under § 1391(e): "The *Stafford* Court determined that in enacting [§ 1391(e)], Congress intended primarily to allow plaintiffs to bring actions against government officers for injunctions in districts other than the District for the District of Columbia." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993). This Court has further noted that § 1391(e) applies to suits for declaratory relief. *See In re United States Parole Comm'n*, 793 F.2d 338, 348 (D.C. Cir. 1986) (citing 28 U.S.C. §

(footnote continued from previous page)
F.3d 8, 9 n.1 (D.C. Cir. 2005). Charles E. Samuels, Jr., – Lappin's successor as the Director of BOP – appears to have been added to this action by this Court.

1391(e) for proposition that "[v]enue in the District of Columbia is proper for

Pearson's declaratory and injunctive suit against the [United States Parole]

Commission."), *vacated for en banc rehearing In re United States Parole Comm'n*,

798 F.2d 1532 (D.C. Cir. 1986), *remanded as moot In re United States Parole*

*Comm'n,* No. 85-1205, 1987 U.S. App. LEXIS 18336 (D.C. Cir. Dec. 30, 1987).

Consistent with these decisions, Pinson alleges claims for injunctive and

declaratory relief against federal officials contemplated by § 1391(e) because his

claims, in substance, attack unconstitutional policies adopted by the United States

with respect to federal prisoners.  In the first count of his complaint, he seeks

declaratory and injunctive relief declaring BOP Program Statement 5217.01, which

created SMUs, unconstitutional and seeking an injunction against coercing inmates

to reside together in these units.  AA10.  In the second count of his complaint, he

attacks and seeks to halt BOP policies that allow prison officials to disregard the

legal nature of his prisoner mail.  AA9.  Given that he filed claims for injunctive

and declaratory relief to police the official acts of federal officials, § 1391(e)

controls Pinson's claims, and venue properly lies in the District of Columbia

(under the terms of § 1391(e)) because a defendant (indeed two:  Lappin and

Conley) reside here.  With the District Court having held that venue was improper

in the District of Columbia and lay in Alabama – due to its erroneous application

of § 1391(b) rather than § 1391(e) – the District Court "failed to consider the

applicable statutory criteria" and can be corrected via a writ of mandamus. *Ukiah*, 981 F.2d at 548.

To be sure, Pinson clearly also brings claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[9] *See* AA61-62 (Pinson characterizing his damages claims as being pursued under *Bivens*). Under *Stafford*, § 1391(e) applies only to suits against government officers in their official capacities, "not to *Bivens* actions." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993) (citing *Stafford*, 444 U.S. at 542-43). In *Stafford*, the Supreme Court found that the language in § 1391(e) allowing claims against an official acting in his official capacity or under color of legal authority" did not unlock the key to venue "for money damages actions brought against an official as an individual." *Stafford*, 444 U.S. at 539.

Nevertheless, venue is (or remains) proper in the District of Columbia even over Pinson's *Bivens* claims because venue is appropriate over the injunctive and declaratory claims against government officials acting in their official capacities.

_____

[9] In *Bivens*, the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389. "'*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.'" *Munsell v. Dep't of Agric.*, 509 F.3d 572, 588 (D.C. Cir. 2007) (quoting *Carlson v. Green*, 446 U.S. 14, 18-19 (1980)).

Though "[t]he general rule is that venue must be established as to each separate cause of action," this Court has stated that, if venue is only proper as to one federal claim, then the same venue may be established for another claim "*if they amount to only one cause of action* with two grounds for relief." *Beattie v. United States*, 756 F.2d 91, 100 (D.C. Cir. 1984), *overruled on other grounds by Smith v. United States*, 507 U.S. 197 (1993) (emphasis in original). Such a principle may apply to determine that venue is proper for different claims when a plaintiff seeks damages for essentially a "single" wrong, against the same defendants, and the grounds are identical as to proof. *Id*. at 101.

In his complaint, Pinson is seeking different types of relief for two wrongful policies he claims violated his constitutional rights. His claim for damages in Count One of his complaint grows out of unconstitutional policies that created SMUs, which placed him in "imminent danger of death or serious bodily injury." AA9. These are the same polices against which he is seeking injunctive and declaratory relief. AA10. Likewise, his request for damages for his First Amendment claim grows out of the mail-handling policies and his complaint can be construed as seeking injunctive relief (to halt those policies). Hence, because venue is proper for his claims for declaratory and injunctive relief, it should also be proper for his *Bivens* claims.

In the alternative, the Court may exercise "pendent venue" over Pinson's *Bivens* actions.  Pendent venue may apply "when one or more claims arising out of a common nucleus of operative facts do not satisfy the requirements of the applicable venue statute." *Beattie*, 756 F.2d at 101.  Whether to apply the principle of pendent venue in any given case is a discretionary decision, based on policy considerations that would "support the exercise of pendent jurisdiction – judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants." *Id.* at 103.  In addition, courts may take into account considerations relevant to venue, such as convenience to litigants, witnesses, and the court system. *Id.* at 104.

Here, all of the relevant factors favor the exercise of pendent venue since Pinson's *Bivens* claims "are very closely linked in their predicate facts" to his other claims in this action, and there are two co-defendants properly venued here. *SEC v. e-Smart Techs.*, *Inc.*, No. 11-895, 2013 U.S. Dist. LEXIS 29138, at *11 (D.D.C. Mar. 1, 2013).  Moreover, Pinson challenges specific BOP policies that are formulated in the District of Columbia and create unconstitutional prison conditions, as such several witnesses are located in the District.  Finally, because

there is no one venue where a majority of the Respondents reside, there is no more

convenient forum for the *Bivens* actions in this case to be brought.[10]

Finally, mandamus is especially appropriate because the district court did

not allow Pinson an opportunity to present his arguments as to why the District of

Columbia is the proper forum to hear his case. *Starnes v. McGuire*, 512 F.2d 918,

929 (D.C. Cir. 1974) (en banc) ("Issuance of mandamus might be supported on the

grounds that the district judge failed to give the petitioner an opportunity to present

his arguments against transfer prior to the entry of the transfer order . . . ."); *Fine v.

McGuire*, 433 F.2d 499, 500 (D.C. Cir. 1970) ("transferring this complaint without

hearing is error that requires prompt correction by this court"). In *Starnes*, this

Court noted that "[t]he process of case-by-case determination requires procedures

better adapted to informing the judge of all relevant considerations than a simple

*sua sponte* order." *Starnes*, 512 F.2d at 933. In this instance, the District Court

issued a one-paragraph *sua sponte* transfer order. The lack of a hearing (including

even just briefing) had real consequences because it prevented the District Court

---

[10] Even if the *Bivens* claims cannot be teamed for venue purposes with the injunctive and declaratory claims, the District Court still committed clear legal error in holding that the District of Columbia was an improper venue for at least the injunctive and declaratory claims. These claims were correctly venued here, and if this Court finds Pinson's *Bivens* claims need to be transferred, then his other claims should be severed in order to remain in Pinson's chosen forum.

from better understanding the focus of this case on agency-wide policies (not just a

single prison's conditions) and that potential plaintiffs existed nationwide.

### 2. On the Transfer Order, There Is No Other Adequate Means than Mandamus to Obtain Relief

Mandamus is further appropriate to vacate the transfer order because there is

"no other adequate means to attain the relief [the petitioner] desires." *Belize*, 668

F.3d at 730 (internal quotation marks and citation omitted; alterations in original).

In this case, venue is not improper in the District of Columbia (making the District

Court's order that the District was an "improper" venue under 28 U.S.C. § 1406(a)

patently erroneous), but it is also potentially not improper in Alabama (or Texas or

Georgia); indeed, it is not uncommon that there is more than one appropriate venue

for a given case (though the plaintiff's choice of forum should not be disturbed

absent another venue being more convenient or just under 28 U.S.C. § 1404(a)).

As a result, if this case proceeds in Alabama, Pinson will not be able to obtain

adequate relief with respect to the District Court's transfer order; on appeal to the

Eleventh Circuit, Pinson will be hard-pressed to show that any reversible error

occurred due to the District Court's transfer of his case to the Alabama district

court.[11]

---

[11] Under § 1391(e), venue would be proper in Alabama because Respondent John T. Rathman, warden at FCI Talladega, is also sued in his official capacity and he resides in that district for purposes of this suit. *See* 28 U.S.C. § 1391(e)(1)(A)

(footnote continued on next page)

The transferee Circuit, in this case the Eleventh Circuit, may find the D.C.

District Court's erroneous ruling under 28 U.S.C. § 1406(a) that the District of

Columbia is an *improper* venue to be harmless because venue could also be proper

in Alabama.  As a consequence, the transfer in this matter is like an unreviewable

discretionary transfer under 28 U.S.C. § 1404(a).  There generally is no adequate

remedy with respect to improper transfer orders under § 1404(a) because as long as

a case is tried in an appropriate venue, a transfer or failure to transfer a case based

upon a motion under § 1404(a) will most likely be shown to be non-prejudicial

upon appellate review.  *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 663 (7th Cir.

2003) ("[Petitioner] would not have an adequate remedy for an improper failure to

transfer the case by way of an appeal from an adverse final judgment because it

would not be able to show that it would have won the case had it been tried in a

convenient forum.").  Indeed, in the Eleventh Circuit, there is no "abuse of []

discretion" when a trial court denies a motion to transfer under § 1404(a) where an

appellant "makes no showing that the trial in [that court] prejudiced his rights to

have a fair trial."  *Nowell v. Dick*, 413 F.2d 1204, 1212 (5th Cir. 1969).[12]

---

(footnote continued from previous page)
(stating venue is proper in this circumstance where "*a* defendant in the action
resides") (emphasis added); *see Nestor*, 425 F.2d at 521.

[12] "Decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent" in
the Eleventh Circuit.  *Roofing & Sheet Metal Servs., Inc. v. LaQuinta Motor Inns,
Inc.*, 689 F.2d 982, 985 (11th Cir. 1982).

Furthermore, Pinson will not have an adequate remedy with respect to the

D.C. District Court's transfer order because, upon transfer, the Eleventh Circuit

will not have appellate review over the transfer order.  This Circuit and the

Eleventh Circuit have noted that, when a case is transferred between Circuits "it is

well established that a transferee court cannot directly review the transfer order

itself."  *Starnes*, 512 F.2d at 924; *accord Roofing & Sheet Metal Services, Inc.*, 689

F.2d at 986.  This principle extends to deny appellate review by the transferee

Circuit over transfer orders from a court in another Circuit.  Under 28 U.S.C.

§ 1294(1) an appeal may lie "[f]rom a district court . . . to the court of appeals for

the circuit embracing the district."  This Court has found that a transfer order

"therefore may effectively become immune from appellate scrutiny" once an

action is transferred outside of the D.C. Circuit.  *See In re Briscoe,* 976 F.2d at

1426 (citing 28 U.S.C. § 1294(1)).

The Eleventh Circuit has reached the same result based on precedent from

the Fifth Circuit, which has held that it does not have the power to review civil

contempt orders issued by district courts in other Circuits.  *In re Corrugated*

*Container Anti-Trust Litig.*, 620 F.2d 1086, 1090 (5th Cir. 1980) ("an appeal from

[a] contempt order [from the Southern District of New York] would be proper only

in the Second Circuit Court of Appeals").  The Eleventh Circuit has interpreted this

holding to mean that a transfer order cannot be reviewed by the appellate court in

the transferee Circuit. *See La Quinta*, 689 F.2d at 986 (finding no "principled basis for distinguishing" the holding in *Corrugated Container*). Thus, it is clear that any further review of the D.C. District Court's transfer order will be foreclosed if this Circuit does not allow mandamus review here. As a result, mandamus review is appropriate in this instance.

The Supreme Court's decision in *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379 (1953), does not alter this analysis. In *Bankers Life*, the Supreme Court ruled that the writ was not appropriate to review a transfer order under § 1406(a). The Supreme Court addressed the petitioner's argument that the respondent judge did not have power to transfer the case under § 1406(a) because venue was properly laid in the forum where the petitioner initially brought his case, but the Court found that mandamus was not appropriate because, among other reasons, the transfer decision was "reviewable upon appeal after final judgment." 346 U.S. at 381-82. However, important to the decision in *Bankers Life* was that fact that, in that case, unlike here, appellate review was available because the case was transferred *within the same Circuit*. *Id*. at 382.

## C.     Mandamus Is Appropriate to Instruct the District Court Clerk to Present the Refused Motion to a District Judge

The Court should also issue the writ because the clerk's office usurped judicial authority when it rejected Petitioners' filings. Under the Federal Rules of Civil Procedure, the clerk's return of the Motion For Leave to Join or Amend was

error because only a judicial officer has the authority to reject filings to a district court. The Federal Rules do not grant such authority to the clerks of the district courts. *See McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 102 (5th Cir. 1995).

Fed. R. Civ. P. 5(d)(4) provides: "The clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice." The Advisory Committee Note to the 1991 Amendments to the Federal Rules of Civil Procedure further states:

> Several local district rules have directed the office of the clerk to refuse to accept for filing papers not conforming to certain requirements of form imposed by local rules or practice. This is not a suitable role for the office of the clerk, and the practice exposes litigants to the hazards of time bars; for these reasons, such rules are proscribed by this revision. *The enforcement of these rules and of the local rules is a role for a judicial officer*. A clerk may of course advise a party or counsel that a particular instrument is not in proper form, and may be directed to so inform the court.

Fed. R. Civ. P. 5, Advisory Committee Note (emphasis added).

Based upon the language in Rule 5(d) (earlier codified in a different subsection of Rule 5), the Fifth Circuit has held that the clerk's office lacks authority to reject pleadings that do not comply with the Federal Rules of Civil Procedure. *McClellon*, 66 F.3d at 102 (holding that absent "specific instructions from a 'judicial officer,' the clerk of court lacks authority to refuse or to strike a pleading presented for filing"). Similarly, a district court in this Circuit has also held that non-compliance with local rules is not a proper basis for the clerk's office

- 53 -

to reject pleadings for filing and that only a federal judge should make that determination. *Innovatit Seafood Sys., LLC v. Comm'r for Patents*, 240 F.R.D. 23, 25 (D.D.C. 2007) ("[J]udges, rather than clerks, should enforce the local rules.") (citing Fed. R. Civ. P. 5, Advisory Committee Note).

In any event, noncompliance with local rules should not hinder a district court judge from accepting documents for filing. The Ninth Circuit has held that "for purposes of the statute of limitations the district court should regard as 'filed' a complaint which arrives in the custody of the clerk within the statutory period but [that] fails to conform with formal requirements in local rules." *Loya v. Desert Sands Unified Sch. Dist.*, 721 F.2d 279, 281 (9th Cir. 1983); *see Gilardi v. Schroeder*, 833 F.2d 1226, 1233 (7th Cir. 1987) (same).

Pursuant to Rule 5(d)(4), if Petitioners' motions were defective, either because of noncompliance with the Federal Rules or the local rules of the district court, this issue, at the very least, should have been referred to a District Court Judge for consideration. Furthermore, if the motions for joinder were defective due to noncompliance with local rules, then this noncompliance would not have hindered a District Judge from accepting them for filing. Here, the clerk appears to have refused to accept Petitioners' documents for filing because of a form issue: Pinson says that the Clerk "attached a note stating 'nobody can sign motions except parties.'" AA109. Rule 5(d)(4) deprives the clerk of any such power,

leaving the filing issue to the District Judge.  The clerk's action was a "usurpation of judicial power" and thereby correctible via mandamus.  *Bankers Life*, 346 U.S. at 383.  And that usurpation was consequential, because the motion's text would have helped inform the District Court of the national scope of the litigation and that official policies adopted in Washington, D.C. were the target of this litigation.

## **<u>CONCLUSION</u>**

Pinson's Motion for Leave to Proceed *in forma pauperis* should be granted; the Court should stay collection of the Pinson's filing fee for the mandamus petition pending full payment of earlier incurred filing fees; and the Court should issue the writ of mandamus to vacate the District Court's transfer order and to instruct the District Court's clerk to present to a District Judge the Motion For Leave to Join or Amend for determination as to whether to reject or to docket the Motion.

Respectfully submitted,

<u>/s/ Anthony F. Shelley</u>
Anthony F. Shelley
Dawn E. Murphy-Johnson
Miller & Chevalier Chartered
655 Fifteenth St., NW, Suite 900
Washington, DC 20005
Telephone: (202) 626-5924
Facsimile: (202) 626-5801
Email: ashelley@milchev.com

June 5, 2013                    *Court-Appointed Amicus Curiae*

- 56 -

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

**Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

<u>XX</u> this brief contains 13,920 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

___ this brief uses a monospaced typeface and contains [*state the number of lines*] of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because:

<u>XX</u> this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font in Times New Roman, or

___ this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


    ____June 5, 2013_____     _____/s/ Anthony F. Shelley_____
          Date                       Anthony F. Shelley

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2013, I electronically filed the foregoing

**BRIEF OF COURT-APPOINTED *AMICUS CURIAE* ON BEHALF OF**

**PETITIONERS** with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

R. Craig Lawrence
U.S. Attorney's Office, Civil Division
Wynne P. Kelley
U.S. Attorney's Office, Appellate Division
555 4th Street, NW
Washington, DC 20530
Email: craig.lawrence@usdoj.gov
Email: wynne.kelly@usdoj.gov

      I further certify that on June 5, 2013 I have mailed a true and correct copy of

the foregoing **BRIEF OF COURT-APPOINTED *AMICUS CURIAE* ON**

**BEHALF OF PEITTIONERS** by First-Class Mail, postage prepaid, to the

following non-CM/ECF participants, addressed as follows:

Jeremy V. Pinson, No. 16267-064
USP Florence AdMax
U.S. Penitentiary
P.O. Box 8500
Florence, CO 81226

Jeremy Brown, No. 31123-074
USP Florence – High
U.S. Penitentiary
P.O. Box 7000
Florence, CO 81226

Andrew W. Hobbs, No. 30723-077
FCI Butner Low
Federal Corrections Institute
P.O. Box 999
Butner, NC 27509

Antoine Bruce, No. 35363-007
USP Florence AdMax
U.S. Penitentiary
P.O. Box 8500
Florence, CO 81226

John S. Leigh, No. 03857-087
USP - Big Sandy
U.S. Penitentiary
P.O. Box 2068
Inez, KY 41224

     I also certify that, on June 5, 2013, I will dispatch, within two business days,

by hand-delivery, the requisite EIGHT (8) copies of the **BRIEF OF COURT-**

**APPOINTED *AMICUS CURIAE*, ON BEHALF OF PETITIONERS** to the

Clerk of the United States Court of Appeals for the D.C. Circuit.

                       /s/ Anthony F. Shelley
                       Anthony F. Shelley